**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RENEE C. PEREZ,<br><br>                          Plaintiff,<br>vs.<br><br>COZEN & O'CONNOR GROUP LONG TERM DISABILITY COVERAGE, an employee welfare benefit plan under ERISA,<br><br>                          Defendant. | CASE NO. 05cv0440 DMS (AJB)<br><br>**MEMORANDUM OF DECISION AND ORDER** |

      Plaintiff Renee Perez filed the Complaint in this case on March 4, 2005. The Complaint alleges (1) a claim for declaratory relief for benefits due, to enforce rights for benefits, and to clarify future rights to benefits under a long-term disability plan issued by The Prudential Insurance Company of America ("Prudential") to Plaintiff's former employer, Cozen & O'Connor, and (2) a claim for equitable relief. Plaintiff seeks (1) an award of disability benefits from May 31, 2002, to the present, including pre- and post-judgment interest, (2) reinstatement of her life insurance coverage, (3) an injunction preventing Prudential from altering its benefits plan, (4) a finding that Prudential's use of Dr. Amy Hopkins to perform medical record reviews reflects bias on the part of Prudential, and (5) attorneys' fees and costs. Defendant argues its decision to terminate Plaintiff's benefits was correct, and therefore, it is entitled to judgment.

      The case came on regularly for a bench trial on December 4, 2006. Susan L. Horner appeared on behalf of Plaintiff, and A. Louis Dorny appeared on behalf of Defendant. Counsel raised several

evidentiary, factual and legal issues in their pleadings and at oral argument, which the Court addresses below.

# I.

# EVIDENTIARY ISSUES

The parties raised two evidentiary issues before and during the trial of this case. The first issue is whether the Court should consider evidence outside the Administrative Record. The second issue is whether the Court should decline to consider certain evidence in the Administrative Record. These issues are discussed in turn.

### A.   Evidence Outside the Administrative Record

This is not the first time the parties have raised the issue of whether this Court should consider evidence outside the Administrative Record in deciding this case. The parties first raised this issue in the briefing on Plaintiff's motion for summary judgment, with both parties offering extrinsic evidence. The Court declined to decide the issue at that time because it was unnecessary to resolve Plaintiff's motion. However, the Court indicated it would decide the issue when ruling on Defendant's motion for leave to expand the Administrative Record. Plaintiff was invited to file a similar motion, or a motion *in limine*, if she wished to offer her own extrinsic evidence.

After ruling on Plaintiff's motion for summary judgment, the Court issued its ruling on Defendant's motion to expand the record to include surveillance evidence of Plaintiff. In ruling on that motion, this Court stated:

> In cases such as this, where the court is reviewing an administrator's decision to deny benefits under an ERISA plan, "the record that was before the administrator furnishes the primary basis for review." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999). In *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938 (9th Cir. 1995), the Ninth Circuit held "that new evidence may be considered under certain circumstances to enable the full exercise of informed and independent judgment." *Id.* at 943. However, the court emphasized "that a district court should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the plan administrator." *Id.* at 944. A district court should exercise its discretion to allow additional evidence "only when such evidence is needed to conduct an adequate de novo review." *McCoy v. Federal Ins. Co.*, 7 F.Supp.2d 1134, 1141 (E.D. Wash. 1998) (citing *Mongeluzo*, 46 F.3d at 943-44).

The Court found Defendant's proffered surveillance evidence was not necessary for its review, and therefore denied Defendant's motion.

Plaintiff did not file a motion for leave to expand the record, but she now seeks to admit three types of extrinsic evidence: (1) Plaintiff's recent medical records from Jorge Perez, M.D., (2) evidence concerning Dr. Hopkins' participation in other disability determinations, and (3) a recent declaration from Gerard P. Harney, a member of Cozen & O'Connor. None of this evidence, however, is necessary to the Court's *de novo* review. Accordingly, the Court declines to consider this, or any other evidence, outside of the Administrative Record.

**B.     Evidence in the Administrative Record**

Next, Plaintiff objects to specific items of evidence contained in the Administrative Record. Specifically, Plaintiff objects to (1) the statements of the video surveillance operators, (2) the video surveillance itself, and (3) Dr. Hopkins' report. However, Plaintiff fails to provide any legal authority supporting her right to object to evidence in the Administrative Record, or the Court's authority to strike evidence in the Administrative Record. In the absence thereof, the Court overrules Plaintiff's objections to the evidence listed above. *See Raithaus v. Unum Life Ins. Co. of Am.*, 335 F.Supp.2d 1098, 1120 (D. Hawaii 2004) (denying motion to strike evidence from the administrative record).

Based on these rulings, the Court has considered solely the evidence in the Administrative Record, and issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II.

## FINDINGS OF FACT

1.    Plaintiff Renee Perez ("Plaintiff") is a thirty-six (36) year old woman. She is married, and has two children.

2.    In January 1997, Plaintiff began working for the law firm Cozen & O'Connor as a law clerk. At the time, Plaintiff was a student at the University of San Diego School of Law.

3.    Plaintiff graduated from law school in 1998, and began working as an associate attorney at Cozen & O'Connor in August of 1998. (Administrative Record ("AR") at 001489.)[1]

---

[1] For the sake of clarity, the Court refers to the Administrative Record attached to Mr. Dorny's declaration in opposition to Plaintiff's motion for summary judgment, which appears to be Docket Number 60, and is Bates-stamped PRU-PERE 000001-001868. All further references to the Administrative Record are to this set and these Bates numbers.

4. As an employee of the firm, Plaintiff enrolled in a long term disability plan offered by Prudential. The Policy provides long term disability insurance in case of "Total Disability."

"Total Disability" exists when Prudential determines that all of these conditions are met:

(1) Due to Sickness or accidental injury, both of these are true:

(a) You are not able to perform, for wage or profit, the material and substantial duties of your occupation.

(b) After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience. The Initial Duration is shown in the Schedule of Benefits.

(2) You are not working at any job for wage or profit.

(3) You are under the regular care of a Doctor.

(*Id.* at 001057.)

5. On September 24, 1998, Plaintiff received pre-travel immunizations from the International Traveler's Clinic for a one-week mid-October 1998 hiking trip to high-altitude urban and rural Peru. (*Id.* at 000959-60.) While in Peru, Plaintiff developed a severe bout of gastroenteritis. (*Id.* at 000997.) 6. On October 6, 1998, Plaintiff was involved in a rear-end motor vehicle accident, her car having been hit from behind. (*Id.* at 000991.) Plaintiff presented to the urgent care center at Sharp Medical Center with complaints of pain and soreness in her neck and shoulders. (*Id.*)

7. In November of 1998, Plaintiff began assisting a partner with a trial in Orange County. (*Id.* at 001092.) During that trial, Plaintiff began experiencing symptoms of a head cold, but she continued with the trial and saw it to completion. (*Id.*)

8. On November 12, 1998, Plaintiff presented to the urgent care center at Sharp Medical Center complaining of headaches, exhaustion, congestion, fatigue and sore throat. (*Id.* at 000994.) She was examined and diagnosed with sinusitis, bronchitis and pharyngitis. (*Id.*)

9. One week later, she presented to her primary care physician, Frank Gilman, M.D. (*Id.* at 000995.) She reported a decrease in throat pain, but persistent headaches and fatigue. (*Id.*) Dr. Gilman's impression was Plaintiff had pharyngitis. (*Id.*) Lab tests were performed, and were positive for mononucleosis.

10. During this time, Plaintiff continued to work at Cozen & O'Connor, but on a reduced schedule. She stopped working altogether on January 21, 1999.

11. On January 22, 1999, Plaintiff returned to Dr. Gilman. (*Id.* at 000996.) She reported that she was still fatigued despite sleeping for twelve hours at night and taking a one to two hour nap during the day. (*Id.*) She also reported having a sore throat several times per week. (*Id.*) Dr. Gilman referred Plaintiff to Steven Gardner, M.D. for a consultation, and also prescribed Zoloft. (*Id.*)

12. Plaintiff reported to Dr. Gardner on January 27, 1999. (*Id.* at 000997-98.) At that time, Plaintiff reported continued exhaustion, headaches, sore throat and occasional swelling of her lymph nodes. (*Id.* at 000997.) He took Plaintiff's history, examined her, and ordered some tests. (*Id.* at 000997-98.)

13. Plaintiff returned for a follow-up with Dr. Gardner on February 3, 1999. (*Id.* at 000999.) In his report of that date, Dr. Gardner wrote: "[Plaintiff's] symptoms of severe fatigue, low-grade fever, sore throat, painful lymph nodes, and generalized headaches would fit the CDC criteria for chronic fatigue syndrome." (*Id.*)[2] Dr. Gardner did not diagnose Plaintiff with CFS, however, because she had not reported these symptoms for six months. (*Id.*) He advised her to return in two weeks. (*Id.*)

14. On February 5, 1999, Cozen & O'Connor informed Plaintiff that she was entitled to up to twelve weeks of leave pursuant to the Family and Medical Leave Act, and that she would have to return to work by April 16, 1999. (*Id.* at 001424.)

///

---

[2] The Center for Disease Control ("CDC") states a patient can be classified as suffering from CFS "if the patent meets both the following criteria:

1. Clinically evaluated, unexplained persistent or relapsing chronic fatigue that is of new or definite onset (i.e., not lifelong), is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities.

2. The concurrent occurrence of four or more of the following symptoms: substantial impairment in short-term memory or concentration; sore throat; tender lymph nodes; muscle pain; multi-joint pain without swelling or redness; headaches of a new type, pattern or severity; unrefreshing sleep; and post-exertional malaise lasting more than 24 hours. These symptoms must have persisted or recurred during 6 or more consecutive months of illness and must not have predated the fatigue."

(*Id.* at 001571-72.)

15. Pursuant to Dr. Gardner's instructions, Plaintiff returned to his office on February 18, 1999. (*Id.* at 001000.) At that time, Plaintiff reported severe fatigue, sore throat, and intermittent lymph node swelling. (*Id.*) Dr. Gardner stated: "Patient's symptoms most consistent with chronic fatigue syndrome. At this point she fits the CDC criteria." (*Id.*) Dr. Gardner prescribed some low-dose antidepressants, and advised Plaintiff to follow up with Dr. Gilman. (*Id.*)

16. Plaintiff returned to Dr. Gilman on March 11, 1999. (*Id.* at 001001.) At that time, she continued to complain of chronic fatigue despite more than twelve hours of sleep per night. (*Id.*) She also complained of a sore throat. (*Id.*) Dr. Gilman's impression was Plaintiff was suffering from CFS, and he advised her to follow up in three months. (*Id.*)

17. On March 26, 1999, Dr. Gardner prepared a letter stating he had diagnosed Plaintiff with CFS, and as a result of the CFS, Plaintiff was unable to work. (*Id.* at 001002.)

18. Plaintiff returned to Dr. Gilman on April 20, 1999, and continued to complain of fatigue after exercise. (*Id.* at 001003.)

19. On May 19, 1999, Cozen & O'Connor informed Plaintiff that her short-term disability benefits would cease in July 1999. (*Id.* at 001420). Cozen informed Plaintiff that she should file an application for long-term disability benefits by filling out the appropriate form, having her doctor complete the form, and returning it to Cozen's benefits coordinator. (*Id.*) Cozen informed Plaintiff that according to office policy, her position and benefits were secure for six months, but that six-month period would end on July 21, 1999. (*Id.* at 001421.)

20. On June 25, 1999, Plaintiff returned to Dr. Gilman with continued complaints of chronic fatigue. (*Id.* at 001004.) She also complained of chronic low-grade fever, sore throat and headaches. (*Id.*)

21. Meanwhile, Plaintiff submitted the application for long-term disability benefits to her benefits coordinator at Cozen & O'Connor, who submitted the application to Prudential on July 15, 1999. (*Id.* at 001419.)

22. Plaintiff returned to Dr. Gilman on July 30, 1999, and August 16, 1999, with continued complaints of chronic fatigue. (*Id.* at 001005-06.) In fact, on August 16, Plaintiff requested a wheelchair for shopping and visiting with friends. (*Id.* at 1006.)

1  23.     During this time Prudential arranged for Plaintiff to attend an Independent Medical
2  Examination ("IME") with an infectious disease specialist, Gonzalo Ballon-Landa, M.D., (*Id.* at
3  000948-51.)  That appointment was scheduled for September 15, 1999. (*Id.*)
4  24.     However, on September 1, 1999, Prudential approved Plaintiff's claim for benefits under the
5  Policy, effective July 21, 1999. (*Id.* at 000954-55.)
6  25.     On September 9, 1999, Plaintiff applied for disability insurance benefits from the State of
7  California, (*id.* at 001535-37), which application was granted.
8  26.     On September 15, 1999, Plaintiff presented for her IME with Dr. Ballon-Landa. (*Id.* at
9  000935-39.) Dr. Ballon-Landa prepared a report of his findings, including a detailed patient history.
10 (*Id.*) He also conducted a physical examination of Plaintiff. His assessment was Plaintiff "has a
11 history compatible with chronic fatigue syndrome by CDC criteria, with prolonged exhaustion, now
12 ten months in duration, tender lymphadenopathy and negative work up for other diseases." (*Id.* at
13 000938.) Dr. Ballon-Landa concluded, "[b]ased on the history and the review of the records, it
14 appears that the patient could not successfully perform her duties as an attorney." (*Id.*)
15 27.     On December 21, 1999, Plaintiff submitted a claim for social security disability benefits. (*Id.*
16 at 001516-26.) The Social Security Administration approved Plaintiff's claim on March 20, 2000.
17 (*Id.* at 000925.)
18 28.     Prudential continued to monitor Plaintiff's condition over the next several months. (*Id.* at
19 000010-12.)
20 29.     On June 12, 2000, Plaintiff submitted a statement to Prudential. (*Id.* at 000933-34.) In that
21 statement, Plaintiff reported "constant pain & exhaustion. Headaches, muscle aches, sore throats &
22 lymph nodes, 10-15 hours sleep night & still tired, mental confusion, complete inability physical
23 exertion." (*Id.* at 000933.) Dr. Gilman also continued to diagnose Plaintiff with CFS. (*Id.*)
24 30.     On July 10, 2000, Plaintiff returned to Dr. Gilman for treatment of her CFS. (*Id.* at 000872.)
25 At that time, she complained of chronic fatigue and headaches. (*Id.*)
26 31.     On October 2, 2000, Plaintiff learned she was pregnant. (*Id.* at 000873.)
27 32.     On October 12, 2000, Plaintiff returned to Dr. Gilman, who assessed Plaintiff's CFS as stable.
28 (*Id.* at 000871.)

1    33.    On February 23, 2001, Plaintiff submitted another statement to Prudential. (*Id.* at 000909-10.) In that statement, Plaintiff stated: "Chronic fatigue syndrome leaves me constantly exhausted and in pain. I get muscle aches, joint aches, severe headaches, sore throat & swollen lymph nodes, mental confusion." (*Id.* at 000909.) Dr. Gilman also continued to diagnose Plaintiff with CFS. (*Id.*)

34.    During this time, Prudential continued to monitor Plaintiff's condition. (*Id.* at 000013-16.) In May 2001, Prudential noted Plaintiff's pregnancy, and recommended that they obtain updated medical records. (*Id.* at 000013.) Prudential also suggested surveillance of Plaintiff, and a review of her medical records. (*Id.*)

35.    On June 2, 2001, Plaintiff gave birth to a son. (*Id.* at 000555.)

36.    On July 6, 2001, Plaintiff presented to Dr. Gilman for treatment of CFS. (*Id.* at 000523.) At that time, Plaintiff complained of headaches, and Dr. Gilman continued in his impression that Plaintiff was suffering from CFS. (*Id.*)

37.    On August 15, 2001, Dr. Gilman completed a work status form at Prudential's request. (*Id.* at 000563.) In that form, Dr. Gilman reported Plaintiff could not work due to CFS. (*Id.*)

38.    On September 18, 2001, Prudential continued to monitor Plaintiff's condition. (*Id.* at 000017.) Prudential suggested obtaining updated medical records, and a referral for surveillance. (*Id.*)

39.    On September 28, 2001, Plaintiff returned to Dr. Gilman for treatment of CFS. (*Id.* at 000528.) At that time, she reported no improvement in her symptoms. (*Id.*) She also informed Dr. Gilman she was planning to move to Florida with her family. (*Id.*)

40.    On September 30, 2001, Plaintiff completed an Activities of Daily Living Questionnaire at Prudential's request. (*Id.* at 000553-60.) In that questionnaire, Plaintiff reported her current medical condition as follows: "chronic exhaustion, need for excessive sleep, inability to physical exertion, chron pain (headaches, bone - muscle aches) sore lymph nodes, difficulty concentrating, muscle fatigue, sore throat, intolerance to stress of any kind, frequent urination." (*Id.* at 000553.)

41.    On October 18, 2001, a private investigator conducted surveillance of Plaintiff at Prudential's request. (*Id.* at 000786-92.) Plaintiff was not observed on that date. (*Id.* at 000786-89.) Surveillance was continued on October 20, 2001. On that date, Plaintiff was observed exiting her apartment and picking up a small box. (*Id.* at 000790.) Approximately two hours later, Plaintiff was videotaped

1 exiting her apartment with her newborn son in her arms. (*Id.* at 000791.) She sat in a chair, holding her son. (*Id.*) Seven minutes later, she got up, and returned to her apartment. (*Id.*)

42. Prudential noted this surveillance in its file on November 18, 2001. (*Id.* at 000018.) That note also discussed repeat surveillance following Plaintiff's relocation to Florida. (*Id.*)

43. That surveillance took place in December 2001. (*Id.* at 000775-85.) On December 17, 2001, the investigator conducted surveillance of Plaintiff from 8:00 a.m. to 6:00 p.m. (*Id.* at 000777.) Plaintiff was videotaped exiting her residence to retrieve her mail and then returning to her residence. (*Id.*) The following day, Plaintiff was videotaped:

> walking, entering and exiting her vehicle, driving, and carrying/holding an infant, lifting an infant, picking up and carrying items, operating a vehicle, and riding as a passenger in a vehicle. [Plaintiff] was observed bending over at the waist and lifting a collapsed stroller and placing it into the trunk of her vehicle. [Plaintiff] was observed sitting in a doctor's waiting room and filling out medical forms.

(*Id.*) The investigator continued his surveillance the following day from 7:29 a.m. to 5:30 p.m. (*Id.*) He videotaped Plaintiff taking out the trash, retrieving her mail, shaking a bed sheet outside, and conversing on a portable telephone. (*Id.*)

44. Prudential noted this surveillance in its file on January 12, 2002. (*Id.* at 00019.) In that note, Prudential reflected its plan to discuss Plaintiff's condition with a medical consultant.

45. The next entry in Prudential's file is on January 28, 2002. (*Id.* at 000020-25.) That entry appears to include a medical review performed by psychiatrist Marcia Scott, M.D. Dr. Scott concluded Plaintiff's activities, as reported to and observed by her doctors and on the surveillance videos, were "not consistent with chronic illness, energy limitations or severe inactivity." (*Id.* at 000024.) Dr. Scott stated "no medical condition that would prevent work is documented." (*Id.*)

46. Based on Dr. Scott's conclusions, Prudential decided Plaintiff was not "Totally Disabled" under the Policy, and her benefits should be terminated. (*Id.* at 000025.)

47. On February 5, 2002, Prudential notified Plaintiff that her benefits would be terminated on May 31, 2002. (*Id.* at 000108-11.) In that letter, Prudential stated: "Effective June 1, 2002, your claim has been closed." (*Id.* at 000108.)

48. On January 23, 2003, Plaintiff filed her first request for reconsideration of Prudential's termination of her benefits. (*Id.* at 000462-89.) With that letter, Plaintiff submitted a September 16,

1  2002 letter from Mark A. Vacker, M.D., who had been treating Plaintiff after she moved to Florida.
2  (*Id.* at 000471.) In that letter, Dr. Vacker stated his belief "that Ms. Perez meets the CDC Criteria for
3  Chronic Fatigue Syndrome and that she is incapable of working." (*Id.* at 001568.) Plaintiff also
4  submitted numerous documents on CFS. (*Id.* at 000472.)

5  49.  On February 26, 2003, Prudential referred Plaintiff's claim to Dr. Amy Hopkins for her review
6  and a report. (*Id.* at 000102.) Dr. Hopkins is board certified in Internal Medicine and Occupational
7  Medicine, and is a Fellow of the American College of Occupational and Environmental Medicine.
8  (*Id.* at 000435.)

9  50.  On March 7, 2003, Prudential denied Plaintiff's first request for reconsideration of its decision
10 to terminate Plaintiff's benefits. (*Id.* at 000097-100.) That denial is based in large part on Dr.
11 Hopkins review of Plaintiff's file. (*Id.*)

12 51.  On June 25, 2003, Plaintiff notified Prudential of her intent to appeal. (*Id.* at 000608-11.)
13 With that letter, Plaintiff submitted an April 28, 2003 report from Jorge Perez, M.D., Plaintiff's then-
14 treating physician. (*Id.* at 000610.) In that letter, Dr. Perez states he noted "during [his] physical
15 examinations that Mrs. Perez had cervical and submandibular lymphadenopathy, which is common
16 in cases of Chronic Fatigue Syndrome." (*Id.* at 000442.) He also reported her other symptoms of
17 "severe fatigue, intolerance for physical exertion, recurrent headaches, arthralgias, myalgias, and
18 decreased ability to concentrate." (*Id.*) Dr. Perez opined "that Mrs. Perez remains totally disabled
19 and unable to do work of any kind as a result of her illness." (*Id.*)

20 52.  Plaintiff also submitted an April 22, 2003 report from Cary Frank Schwimmer, Psy.D. (*Id.* at
21 000610). Dr. Schwimmer conducted a diagnostic interview with Plaintiff on April 9, 2003. (*Id.* at
22 000444.) In that letter, Dr. Schwimmer reported Plaintiff's symptoms of "fatigue, joint and bone
23 aches, muscle aches, swollen lymph nodes, soar [sic] throat, weakness, an increased need for sleep,
24 and severe headaches." (*Id.*) Based on his interview with Plaintiff, Dr. Schwimmer stated there was
25 no evidence of depression. (*Id.*)[3]

26 ///

27 ─────────
28 [3] It appears Plaintiff provided this report in response to Dr. Hopkins' complaint that Plaintiff "has not been referred for a mental health evaluation to determine if there is a psychiatric cause for her symptoms." (*Id.* at 000098.)

53. In addition to providing these documents, Plaintiff requested a list of records provided to Dr. Hopkins for her review. (*Id.* at 000609.)

54. On October 14, 2003, Plaintiff formally filed a second request for reconsideration of Prudential's termination of her benefits. (*Id.* at 000410-19.)

55. In response, Prudential sent Plaintiff's file for review by one of its medical directors. (*Id.* at 000031-32.) That review was performed by Robert MacBride, M.D. (*Id.* at 000033-36.) Dr. MacBride opined "there is no credible medical evidence to explain and support an extended period of loss of work capacity on the basis of this controversial illness descriptor - CFS." (*Id.* at 000035-36.)

56. On November 11, 2003, Dr. MacBride provided additional comments on Dr. Schwimmer's report, but did not alter his previous opinion. (*Id.* at 000038.)

57. On November 12, 2003, Plaintiff provided Prudential with a copy of the Social Security Administration's Notice of Continuing Disability Review. (*Id.* at 000270.)

58. On December 2, 2003, Prudential denied Plaintiff's second request for reconsideration of its decision to terminate Plaintiff's benefits. (*Id.* at 000091-93.)

59. On July 15, 2004, Plaintiff filed a third request for reconsideration of Prudential's termination of her benefits. (*Id.* at 000251-62.)

60. On July 23, 2004, Prudential decided to have another doctor review Plaintiff's medical record and perform another IME. (*Id.* at 000040.)

61. The Policy provides: "Prudential, at its own expense, has the right to examine the person whose loss is the basis of the claim. Prudential may do this when and as often as is reasonable while the claim is pending." (*Id.* at 001067.)

62. On August 2, 2004, Prudential requested that Plaintiff attend an IME with Dr. Anthony Dorto. (*Id.* at 000087.) Plaintiff refused this request. (*Id.* at 000227-28.)

63. On August 30, 2004, Prudential denied Plaintiff's third request for reconsideration of its termination of Plaintiff's benefits. (*Id.* at 000081-82.)

64. Plaintiff thereafter filed the present Complaint.

/ / /

/ / /

## III.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

2. Prudential's decision to terminate Plaintiff's benefits is subject to *de novo* review. *(See* Docket No. 32.)

3. On *de novo* review, the Court must determine whether Plaintiff is disabled within the terms of the Policy. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).

4. Plaintiff bears the burden of proving she was disabled under the Policy. *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F.Supp.2d 1222, 1232 (N.D. Cal. 2003).

5. To meet that burden in this case, Plaintiff must prove that (1) due to sickness or accidental injury, (2) she is unable to perform the material and substantial duties of her occupation, (3) she is not working at any job for wage or profit, and (4) she is under the regular care of a doctor.

6. Plaintiff has met her burden of proving she is suffering from a "Sickness," as that term is defined in the Policy. Specifically, Plaintiff has shown she is suffering from CFS, based on the following evidence:

(a) Plaintiff's treating physicians, Drs. Gilman, Vacker and Perez, have all diagnosed Plaintiff as suffering from CFS. Although the treating physician rule does not apply to disputed ERISA claims, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003), the court "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834;

(b) Dr. Gardner, a diplomate of the American Board of Internal Medicine and Infectious Diseases, examined Plaintiff and diagnosed her as suffering from CFS;

(c) Dr. Ballon-Landa, an infectious disease specialist, examined Plaintiff, and his assessment was Plaintiff "has a history compatible with chronic fatigue syndrome by CDC criteria[.]"

7. The Court is aware that Drs. Scott, Hopkins and MacBride do not concur in Plaintiff's diagnosis of CFS. However, these doctors' opinions are based solely on their review of Plaintiff's file. None of these doctors ever personally observed or examined Plaintiff. Accordingly, the Court does

not give their opinions the same weight as the opinions of Drs. Gilman, Vacker, Perez, Gardner and Ballon-Landa. *See Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (citing *Nord*, 123 S.Ct. at 1971) (stating court may recognize "that a given treating physician has 'a greater opportunity to know and observe the patient' than a physician retained by the plan administrator.") *See also Kearney*, 175 F.3d at 1095 (stating court "can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.")

8.  The Policy does not define or identify "the material and substantial duties" of Plaintiff's occupation as an associate attorney at a law firm. Nevertheless, the Court finds the material and substantial duties of this occupation include the following: reading cases, statutes and other legal authority, pleadings, legal briefs, correspondence, memoranda, and materials from clients; drafting and editing pleadings, legal briefs, correspondence, memoranda, and discovery requests and responses; critically analyzing and interpreting facts and law; performing legal research; taking and defending depositions; representing clients at court hearings; arguing motions before the court; preparing for and participating in trials; meeting deadlines; interacting with clients, co-workers, other attorneys and other parties; and providing competent advice to clients.

9.  Due to CFS, Plaintiff has experienced headaches, exhaustion, congestion, fatigue and sore throat. The headaches, fatigue and sore throat have been persistent since the initial onset of the disease. Plaintiff also suffers from a lack of stamina, decreased concentration, and headaches as a result of reading and writing. (AR at 000934.) Plaintiff also reports the need for at least ten hours of sleep per night, and a daily nap to control her symptoms. (*Id.* at 000554.) These conditions prevent Plaintiff from performing the material and substantial duties of her occupation as an associate attorney at a law firm.

10. There is no dispute that Plaintiff is not working at any job for wage or profit, or that she is under the regular care of a doctor.

11. Accordingly, Plaintiff has met her burden of proving she is totally disabled under the Policy.

12. This conclusion is also supported by the findings of the State of California and the Social Security Administration that Plaintiff is disabled under their respective standards. Although a determination by the Social Security Administration that the plaintiff is disabled under the Social

1   Security Act is not binding on courts reviewing ERISA claims, *Wooten v. Prudential Ins. Co. of Am.*,
2   No. C03-02558 MJJ, 2006 WL 2192061, at *8 (N.D. Cal. July 31, 2006), it is relevant to the ultimate
3   issue of whether the plaintiff is disabled under the Policy. *Boyles v. Unum Life Ins. Co. of Am.*, No.
4   CV-05-6015 CASJWJX, 2006 WL 3405011, at *7 (C.D. Cal. Nov. 20, 2006).

5   13.   Defendant argues Plaintiff breached the Policy when she refused to attend the IME with Dr.
6   Dorto, therefore she is not entitled to benefits from that date forward. However, the Court disagrees.
7   Although the Policy gives Prudential the right to examine a claimant while the claim is pending,
8   Prudential must exercise that right when it is reasonable to do so. Here, Prudential requested that
9   Plaintiff attend a second IME *after* Plaintiff filed her third request for reconsideration of Prudential's
10  decision to terminate her benefits, and two-and-a half years after it first terminated Plaintiff's benefits.
11  Under these circumstances, Prudential's request for a second IME was not reasonable, and thus
12  Plaintiff did not breach the contract when she refused to attend.

13  14.   Defendant also asserts Plaintiff should be estopped from collecting benefits due to her refusal
14  to attend this IME. To prevail on this argument, Defendant must establish "a material
15  misrepresentation, reasonable and detrimental reliance upon the representation and extraordinary
16  circumstances." *Pisciotta v. Teledyne Industries, Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996) (citing *In
17  Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation*, 58 F.3d 896, 907 (3d Cir. 1995)).
18  Defendant must also establish there is an ambiguity in the Policy "such that reasonable persons could
19  disagree as to their meaning or effect[,]" and that the representations involve "an oral interpretation
20  of the plan." *Id.* (citing *Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821 (9th Cir.
21  1992)). Defendant has not shown any of these elements, and thus its estoppel defense is rejected.

22  15.   Because the Administrative Record does not contain any information from Plaintiff to support
23  a finding of total disability after Prudential's August 30, 2004 denial of her third request for
24  reconsideration, the Court finds Plaintiff was totally disabled to that date only. Thus, Plaintiff is
25  entitled to an award of benefits from May 31, 2002, to August 30, 2004.

26  16.   Plaintiff represents that when Prudential terminated her benefits she was receiving $4,083.33
27  per month, less an offset of $1,022.00, which is the amount of her monthly social security disability
28  benefits, for a total of $3,061.33 per month. The Court finds this to be the appropriate amount for

calculating Plaintiff's past benefits. Using this amount, Plaintiff is entitled to past benefits in the amount of $79,594.58.

17. The Court has also balanced the equities in this case, and finds Plaintiff is entitled to prejudgment interest. *See Cherry v. Digital Equipment Corp.*, No. S-05-2165 WBS JFM, 2006 WL 2594465, at *11-12 (E.D. Cal. Sep. 11, 2006) (finding award of prejudgment interest appropriate to fully compensate plaintiff for her injuries). Plaintiff requests the Court award prejudgment interest at ten percent simple interest, compounded annually, but she fails to provide any evidence or argument to support that rate and calculation. Therefore, the Court awards Plaintiff prejudgment interest at the rate provided in 28 U.S.C. § 1961. The rate "should be determined individually for each disability benefit payment that plaintiff was denied, based on [the] rate at the time that the benefit became due." *Cherry*, 2006 WL 2594465, at *12.

18. In accordance with the Court's findings, Prudential shall also reinstate Plaintiff's claim under the Policy, effective May 31, 2002, including her life insurance coverage. The parties' respective rights and duties are therefore reinstated consistent with the terms and conditions of the Policy.

## IV.
## CONCLUSION AND ORDER

Based on the foregoing findings of fact and conclusions of law, the Court orders as follows:

1. Plaintiff shall recover $79,594.58 in past benefits from the period June 1, 2002, to August 30, 2004, plus prejudgment interest at the rate applicable for each benefit payment according to 28 U.S.C. § 1961.

2. If Plaintiff wishes to pursue her request for attorneys' fees and costs, she must file a motion pursuant to Federal Rule of Civil Procedure 54(d).

3. All other relief requested by Plaintiff is denied.

4. The Clerk of Court shall enter judgment consistent with this Order.

**IT IS SO ORDERED**.

DATED: December 13, 2006

_____
DANA M. SABRAW
United States District Judge